* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to the Workers' Compensation Act.
2. The date of the alleged injury is March 27, 2003.
3. An Employer and Employee relationship existed between Plaintiff and Defendant-Employer on March 27, 2003.
4. The Defendant-Carrier was the carrier on the risk on March 27, 2003.
5. The Employee's average weekly wage is $381.78, which yields a compensation rate of $254.53.
6. All medical records and reports relating to treatment of Plaintiff's injury are received into evidence.
7. The recorded statement given by the Plaintiff on May 30, 2003, to Tina Hill of Builders Mutual Insurance Claims Department is received into evidence.
8. Plaintiff's responses to Defendants' Interrogatories and Defendants responses to Plaintiff's Interrogatories are received into evidence.
9. Industrial Commission Forms 18, 19, 33, 33R, and 61 are received into evidence.
10. The parties stipulated into evidence as Stipulated Exhibit # 1, the Pre-Trial Agreement as modified and initialed by the parties.
11. The parties stipulated into evidence as Stipulated Exhibit # 2, medical records.
12. The parties stipulated into evidence as Stipulated Exhibit # 3, Plaintiff's ESC records, by letter filed November 17, 2004.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was approximately 30 years of age, having a birthday of April 24, 2004, and had completed 7th grade. Prior to working for Defendant-Employer, Plaintiff painted on and off from the age of 14 until 17 or 18. He also worked at CL Scrap Metal for approximately 5 months, tearing bags and weighing bags of cans and aluminum and putting them into a packer. His employment history also included working at Winn Dixie as a stocker for approximately 6 months, and working at Burger King as a porter sweeping and mopping the floors for approximately 5-6 months. He also worked in construction for approximately a year.
2. Plaintiff worked for Defendant-Employer from July 27, 1994 to August 17, 1994, from March 3, 1997 to September 17, 1997, and from August 25, 1998 to May 21, 2003. At the time of his alleged injuries, Plaintiff was employed as a yard loader. This position involved lifting a variety of objects throughout the day including, but not limited to: 2×4's (8-20 feet long); 2×12's (8-20 feet long); 6×6's (8-16 feet long); sheet rock (estimated to be between 100-150 pounds which would be carried with another co-worker); plywood (4×8 sheets); single, double, and triple doors; single, double, and triple windows; concrete blocks; bags of concrete weighing between 40-90 pounds; rebar (8 feet, 10 feet, or 20 feet and weighing between 3-20 pounds); and buckets of sheet rock mud. Plaintiff testified he would often have to lift these objects with his wrists in a bent position. Plaintiff also testified that he often drove a forklift or tow motor from 2-3 hours to half the workday. When driving the forklift or tow motor, he sometimes had to stop and load lumber or other materials onto the forklift.
3. Plaintiff's job duties also consisted of sweeping the yard from 1-2 hours per workday and cleaning the bathroom for 15-20 minutes per day. According to Plaintiff, the percentage of time he spent carrying material could vary between 1-2 hours per workday to half the workday. Heavier materials such as 2 × 4's, which were normally in a pack weighing 500-600 pounds, would be moved around with a tow motor that Plaintiff operated on a daily basis. Plaintiff used a pair of band cutters 20-40 times per day to clip metal or plastic bands surrounding the packs of lumber. He also occasionally performed record keeping.
4. This claim involves an alleged injury to Plaintiff's left wrist occurring on March 27, 2003, and bilateral carpal tunnel syndrome, which Plaintiff allegedly contracted from either the March 27, 2003 incident or from his job duties. The incident giving rise to the March 27, 2003 left wrist injury was not witnessed and Plaintiff has given two different versions of how the left wrist injury occurred.
5. The first report of injury, dated March 27, 2003, filled out by Plaintiff's supervisor, Floyd "Junior" Hayes, noted that Plaintiff was attempting to load a 2x10 of lumber onto a forklift when one end of the lumber fell off the pack while Plaintiff was holding the other end causing a sharp jolt to Plaintiff's left wrist. The above version of the incident is consistent with Plaintiff's recorded statement given to the carrier and with the history Plaintiff gave to Dr. Robert Eric Hart at Hart Industrial Clinic when he presented on March 27, 2003.
6. At the hearing before the Deputy Commissioner, Plaintiff's testified that on March 27, 2003, he and another employee were engaged in loading lumber on a tow motor when another employee, Bill Ray, came from behind and grabbed Plaintiff's left arm, twisting it behind his back. Plaintiff testified that when his left arm was twisted, he heard something pop in his left arm. Plaintiff testified that he reported to Mr. Hayes that Bill Ray had twisted his left arm behind his back and that he heard something pop between the wrist and elbow. Plaintiff further testified that Mr. Hayes told him that if he described the accident in that manner the company would fire Mr. Ray and Plaintiff. According to Plaintiff, Mr. Hayes came up with the version of the accident that Plaintiff had hurt his left wrist working with a 2x10 of lumber.
7. Mr. Hayes testified that Plaintiff never mentioned the horseplay incident to him on March 27, 2003. Mr. Hayes testified Defendant-Employer has an employee handbook and one of the rules of employment is that horseplay, including hitting or grabbing another employee, will not be tolerated. According to the testimony of Mr. Hayes, if an employee engaged in horseplay, the employee would receive a verbal warning, 3 days layoff, or be dismissed. This policy was in place and employees were aware of it prior to March 27, 2003.
8. On June 11, 2003, Mr. Hayes received a telephone call from Plaintiff and Plaintiff's wife. Plaintiff spoke to Dent Allison and Mr. Hayes. Plaintiff told Mr. Allison that both of his hands were hurt, that Mr. Hayes lied on the accident report, and that the real version of event was that Bill Ray had twisted his left arm. Mr. Allison then called Mr. Ray and asked if he had engaged in horseplay in the yard with Plaintiff on March 27, 2003. Mr. Ray denied engaging in horseplay and twisting Plaintiff's arm.
9. According to Mr. Hayes, when Plaintiff returned to work after being diagnosed and treated for left wrist sprain at Hart Industrial Clinic on March 27, 2003, he was put on light-duty work consistent with his restrictions. Plaintiff did not miss any time from work due to his injury.
10. Plaintiff testified that his right arm began bothering him in early April 2003, due to overuse. Mr. Hayes testified that he did not observe Plaintiff overusing his right hand when he returned to work at light duty.
11. Dr. Alan Edwards, a board certified physician in family practice and occupational medicine with Hart Industrial Clinic, who treats several patients on a daily basis for hand or arm injuries, examined Plaintiff on April 8, 2003, for a follow-up visit for the injury to his left wrist. Plaintiff told Dr. Edwards that he was doing much better and was no longer wearing the wrist brace at work and was actually performing his normal work duties and tolerating those duties. On physical examination, Plaintiff had full range of motion of his left wrist, as well as good strength in his left wrist. Other than a slight bit of discomfort in the dorsum of the left wrist, the exam was normal. Dr. Edwards diagnosed Plaintiff with a left wrist sprain that was resolving and at that point was almost resolved. He released Plaintiff to full work activities at that time.
12. On May 21, 2003, Plaintiff presented to Dr. Edwards, complaining of increased pain and numbness in his left hand that had spread to his right hand in the week prior. Dr. Edwards diagnosed Plaintiff with bilateral wrist and hand pain suggestive of carpal tunnel syndrome. However, Dr. Edwards's diagnosis was tentative, noting that Plaintiff was having pain of an undetermined etiology and ordered nerve conduction studies. He noted that Plaintiff had exaggerated responses such as excessive withdrawal from a light touch. He felt that Plaintiff's physical responses were excessive when compared to objective findings. Dr. Edwards restricted Plaintiff to no forceful grasping, lifting, pulling, twisting or use of vibrating or impact hand tools. A nerve conduction study was performed on May 23, 2003, which was normal.
13. Dr. Edwards reexamined Plaintiff on May 27, 2003. Plaintiff continued to complain of pain and numbness in both hands and wrists. Dr. Edwards stated that Plaintiff was displaying some pain behavior. He again noted that Plaintiff had pain and paresthesia in both hands and wrists of undetermined etiology.
14. Dr. Jay Piland, another physician at Hart Industrial Clinic, rechecked Plaintiff on May 29, 2003, found that he had a negative Tinel's test, and diagnosed Plaintiff with bilateral paresthesia of questionable etiology. Dr. Piland indicated that he did not feel Plaintiff's problems were related to the left wrist sprain that Plaintiff had on March 27, 2003. Dr. Piland also noted that he did not believe Plaintiff's job was repetitive and therefore if he was developing a neuropathy, he did not believe it was work related. Dr. Piland also questioned whether the problem was a neuropathy based on the normal nerve conduction study.
15. Dr. Jesse Consing, a family practitioner, examined Plaintiff on June 12, 2003. Plaintiff complained of pain in his hand, more on the left than on the right. Dr. Consing felt that Plaintiff's physical exam did show findings specific for carpal tunnel syndrome. Dr. Consing ordered a nerve conduction study, which was performed on June 23, 2003. The study revealed mild right carpal tunnel syndrome. Although Dr. Consing diagnosed Plaintiff with carpal tunnel syndrome, he testified that he did not know the circumstances giving rise to this condition. Dr. Consing was of the opinion that Plaintiff's June 23, 2003 nerve conduction report did not show any evidence of left-handed carpal tunnel syndrome. Looking at the two nerve conduction studies, Dr. Consing testified that it would be difficult to state to a reasonable degree of medical certainty that Plaintiff actually had carpal tunnel syndrome.
16. Dr. Timothy Kirkland, who is a general orthopedic surgeon specializing in the upper extremity areas, examined Plaintiff on June 25, 2003. Dr. Kirkland diagnosed Plaintiff with bilateral upper extremity pain and mild median neuropathy of the right wrist. He noted that there were non-anatomic findings on his examination. Plaintiff had negative Tinel's tests of both elbows and wrists and his Phalen's tests were normal. Dr. Kirkland noted that he was unable to explain the majority of Plaintiff's symptoms. He testified that his diagnosis was typical for a patient who presented without objective findings to explain the cause of their pain.
17. Dr. Kirkland was of the opinion that Plaintiff's reported symptoms on June 25, 2003, were inconsistent with carpal tunnel syndrome based on the distribution of pain, the distribution of the numbness and all of his physical findings. Dr. Kirkland further explained that the history he received from Plaintiff was inconsistent with a diagnosis of carpal tunnel syndrome because, in his opinion, carpal tunnel syndrome typically does not begin immediately or acutely, typically does not involve numbness throughout both arms or throughout the entire arm, and typically does not cause pain throughout the entire arm. He further opined that if Plaintiff were injured when a co-worker grabbed his left arm and bent it behind his back causing a popping sensation, this would be unlikely to cause left-handed carpal tunnel syndrome. Dr. Kirkland examined the two nerve conduction studies done on May 23, 2003, and June 23, 2003, and testified that he did not believe Plaintiff had bilateral carpal tunnel syndrome. He was of the opinion that Plaintiff could do full-duty work.
18. Dr. William Pekman, an orthopedic surgeon, who frequently treats individuals with carpal tunnel syndrome, and frequently performs carpal tunnel release procedures, examined Plaintiff on July 17, 2003, and August 18, 2003. Plaintiff presented for a second opinion at the request of Dr. Consing. Dr. Pekman was given a history that Plaintiff injured his left wrist when it was hyperflexed on or about March 27, 2003, Plaintiff returned to work after the injury and developed pain in the left wrist, and subsequently had similar symptoms in the right wrist. Dr. Pekman reviewed the nerve studies previously taken of Plaintiff. Dr. Pekman diagnosed Plaintiff with pain, but stated that the pain was out of proportion to the injury and he did not have any objective explanation for Plaintiff's complaints of pain. According to Dr. Pekman, Plaintiff did not have any objective findings either by laboratory study or clinical examination to support limiting his activity level. Dr. Pekman did not feel that Plaintiff needed any work restrictions. He could not state to a reasonable degree of medical certainty that Plaintiff actually had carpal tunnel syndrome in either the left or right hand as he did not have either objective clinical findings or nerve study findings to support that diagnosis.
19. Plaintiff had an MRI of his right wrist on July 14, 2003. The only abnormality the MRI showed was a small ganglion cyst, dorsal to the lunate. No fracture or definite abnormality was seen. Plaintiff also had x-rays of his right wrist and hand performed on this date, which were negative. Dr. Pekman did not think Plaintiff was a candidate for any type of carpal tunnel relief surgery to either hand.
20. At deposition, Dr. Pekman was asked about Plaintiff's ability to work in his previous employment with Winn Dixie, Burger King, painting, and construction. He was of the opinion that Plaintiff could return to any of these occupations.
21. Dr. Kirkland, Dr. Consing, and Dr. Edwards agreed with Dr. Pekman's opinion that there was no reproducible evidence for a structural lesion in the extremities that would explain Plaintiff's pain, that Plaintiff's symptoms were inconsistent with objective findings, and that Plaintiff was not a surgical candidate. Dr. Kirkland agreed with Dr. Pekman's August 18, 2003 report which concluded that there was no evidence of significant peripheral nerve compression, that Plaintiff's occupation would not place him at an increased risk over the general public for contracting carpal tunnel syndrome, and Plaintiff's job duties did not cause his bilateral carpal tunnel syndrome.
22. Dr. Consing deferred to Dr. Pekman's opinions on the diagnosis of Plaintiff's hand condition, the treatment regimen and the cause of Plaintiff's hand condition. He also deferred to other physicians that treated Plaintiff on the issue of whether Plaintiff could work.
23. Based on Dr. Edwards' physical examinations of Plaintiff and the studies that he reviewed, he could not state to a reasonable degree of medical certainty that Plaintiff had carpal tunnel syndrome. Dr. Edwards explained that the distribution of Plaintiff's symptoms was not typical for carpal tunnel syndrome in that one side had problems primarily in the ring and little fingers whereas the other hand had problems primarily in the ring and middle fingers and the neurodiagnostic studies were normal or very nearly normal. Dr. Edwards opined that Plaintiff's job did not place him at a significantly increased risk of developing carpal tunnel syndrome as compared to the general public. He explained that Plaintiff's job duties were varied and not repetitive. Dr. Edwards found a slight abnormality in the right median nerve on the second nerve conduction study performed on June 23, 2003. Based upon his physical examination, as well as both nerve conductions studies, Dr. Edwards did not think Plaintiff actually had carpal tunnel syndrome. He testified that the results of his physical examination were not consistent with a median nerve neuropathy because the distribution of Plaintiff's symptoms with provocative testing was not the typical distribution. Plaintiff also had indications of irritability of the ulnar nerve at the wrist that according to Dr. Edwards is not consistent with carpal tunnel syndrome.
24. Dr. Christopher Lechner, of Carolina Hand Surgery Associates, examined Plaintiff on August 28, 2003. He diagnosed him with mild bilateral carpal tunnel syndrome and with an asymptomatic small cyst from the lunotriquetral ligament of the left wrist. Dr. Lechner reexamined Plaintiff on September 11, 2003, and noted his symptoms were out of proportion to the exam. He again examined Plaintiff on September 25, 2003, and noted that the most recent nerve conduction studies were not terribly remarkable with normal left median nerve potentials and the right only very mildly delayed. Dr. Lechner performed a right carpal tunnel release on January 15, 2004. Dr. Lechner did not conclude that the type of job Plaintiff did would put a person at an increased risk for carpal tunnel syndrome. He testified that for an employee to simply use his hands a lot or do a lot of heavy lifting is not enough to cause carpal tunnel syndrome. He could not determine a definite cause of Plaintiff's carpal tunnel syndrome.
25. In Dr. Hart's opinion, Plaintiff did not have any signs of symptoms consistent with carpal tunnel syndrome, and Plaintiff's job did not place him at an increased risk of contracting carpal tunnel syndrome as compared to the general public. When he saw Plaintiff on March 27, 2003, he saw him for a left wrist sprain and did not think the injury had anything to do with carpal tunnel syndrome. Dr. Hart testified that a normal nerve conduction study taken two days after Plaintiff's last day of work on May 21, 2003, could be an indicator that his employment did not play a role in the development of carpal tunnel syndrome. Dr. Hart was of the opinion that although Dr. Menard's nerve conduction study found mild findings of carpal tunnel syndrome, no other criteria were met to allow a diagnosis of carpal tunnel syndrome.
26. Alan Gorrod, a certified ergonomist, performed an ergonomic job analysis on September 30, 2003. He met with Mr. Allison and Mr. Hayes at Defendant-Employer's facility. During this visit, Mr. Hayes took Mr. Gorrod around the facility. Mr. Gorrod observed employees performing job duties similar to Plaintiff's. According to Mr. Gorrod, Plaintiff's job duties did not constitute a high rated, repetition job because the same singular task was not being performed over and over again with no variation. Mr. Gorrod concluded based on his examination of Plaintiff's job duties that he was not at a high risk for contracting upper extremity problems. Mr. Gorrod also testified that within the area of forceful exertion, he did not find that Plaintiff's job involved excessive or extreme types of force. He also did not find extreme range of motion in the job duties Plaintiff had to perform. Mr. Gorrod further concluded that he would not give a high risk rating to the angle of the employees' wrists when carrying objects. He testified that it was not at such an extreme point where it would likely expose an employee to cumulative trauma type disorders.
27. Mr. Gorrod also did not feel Plaintiff's job involved repetitive grasping of items because there were many things that interrupted grasping. For example, workers would have to use a forklift or take things to customers' cars or would be on breaks or down time and this would prevent the job from having continuous grasping or gripping.
28. Plaintiff received weekly unemployment benefits from September 9, 2003 to November 29, 2003, for 12 weeks at $216.00 per week for a total of $2,592.00. He again received unemployment benefits for December 9, 2003 to June 5, 2004, for 26 weeks for a total of $5,434.00. At the time of the hearing on this matter, he had received $8,026.00 in unemployment benefits. Plaintiff represented to the Employment Security Commission that he was ready, willing and able to return to work.
29. Based upon the greater weight of the evidence, Plaintiff's employment with Defendant-Employer did not cause or significantly contribute to the development of bilateral carpal tunnel syndrome; his employment did not place him at an increased risk of developing carpal tunnel syndrome; and any injury that Plaintiff may have sustained on March 27, 2003, did not cause or significantly contribute to the development of carpal tunnel syndrome.
30. Plaintiff sustained a left wrist sprain on March 27, 2003, due to an accident arising out of and in the course of his employment. This incident would be compensable if caused by "horseplay" in the manner described by Plaintiff at hearing or if caused by falling lumber as described in the first report of injury. This accident, however, did not cause Plaintiff any disability.
31. Plaintiff's left wrist sprain from the March 27, 2003 accident was resolving by April 8, 2003, when Dr. Edwards released him to full-duty work and had resolved by May 21, 2003.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident to his left wrist on March 27, 2003. Although Plaintiff gave two different versions of how the accident occurred, either version would have constituted an injury by accident. Based on the greater weight of the evidence, Plaintiff did sustain a wrist sprain on March 27, 2003. N.C. Gen. Stat. § 97-2 (6).
2. Plaintiff did not suffer any disability as a result of the March 27, 2003 injury. Plaintiff was diagnosed with a left wrist sprain, which was nearly resolved as of April 8, 2003. Plaintiff lost no time from work due to this injury and was released by Dr. Edwards with no restrictions or physical limitations on April 8, 2003. N.C. Gen. Stat. § 97-2 (19).
3. Plaintiff has not established that he contracted bilateral carpal tunnel syndrome due to his employment duties with Defendant-Employer or due to trauma from a twisting injury to his left wrist arising out of and in the course of his employment. N.C. Gen. Stat. § 97-53 (13).
4. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him or her to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). Even where the condition may have been aggravated but not originally caused by the Plaintiff's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition.Futrell v. Resinall Corp., 357 N.C. 158, 579 S.E.2d 269 (2003). In addition to establishing increased risk, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc.,136 N.C. App. 351, 524 S.E.2d 368 (2000) (citing Rutledge v. TultexCorp., 308 N.C. 85, 301 S.E.2d 359 (1983)). "Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v. Pilot Freight Carriers, Inc., 300 N.C. 164,265 S.E.2d 389 (1980). Plaintiff has not met his burden of proof on causation or increased risk.
5. Plaintiff is entitled to payment by Defendants for medical treatment received from Dr. Edwards and the Hart Industrial Clinic from March 27, 2003 through April 8, 2003. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation for an occupational disease is DENIED.
2. Defendants shall pay medical expenses arising from Plaintiff's treatment for his March 27, 2003 injury by accident from March 27, 2003 through April 8, 2003, when bills are approved according to Industrial Commission procedure.
3. Defendants shall pay the costs.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_________________ LAURA K. MAVRETIC COMMISSIONER
 S/_________________ DIANNE C. SELLERS COMMISSIONER